UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA
BATON ROUGE DIVISION

| | | |
|---|---|---|
| ADVOCACY CENTER, | * | CIVIL ACTION NO._____ |
| | * | |
| PLAINTIFF, | * | |
| | * | |
| | * | SECTION _____ |
| | * | |
| VS. | * | |
| | * | |
| JAMES M. LEBLANC, SECRETARY OF | * | JUDGE _____ |
| THE LOUISIANA DEPARTMENT OF | * | |
| PUBLIC SAFETY AND CORRECTIONS; | * | |
| JERRY GOODWIN, WARDEN OF | * | |
| DAVID WADE CORRECTIONAL | * | |
| CENTER and LONNIE NAIL, | * | |
| | * | |
| DEFENDANTS. | * | MAGISTRATE JUDGE _____ |

## COMPLAINT

### I. INTRODUCTION

1. Plaintiff Advocacy Center is the designated Protection and Advocacy (P&A) system for individuals with disabilities in the state of Louisiana pursuant to the Protection and Advocacy for Individuals with Mental Illness Act ("PAIMI Act"), 42 U.S.C. §§ 10801 *et seq.*; the Developmental Disabilities Assistance and Bill of Rights Act of 2000 ("PADD Act"), 42 U.S.C. §§ 15001 *et seq.*; and the Protection and Advocacy of Individual Rights Program ("PAIR Act"), 29 U.S.C. § 794e (hereinafter collectively referred to as the "P&A Acts"). These statutes mandate that Plaintiff work to protect the rights of people with disabilities.

2. The Advocacy Center has probable cause to believe that Defendants are subjecting prisoners with disabilities at David Wade Correctional Center (DWCC) to neglect and abuse related to the conditions of segregated confinement and the lack of adequate mental health services. As a result of its probable cause findings, the Plaintiff P&A has

initiated an investigation of these serious claims of abuse. Among other things, Plaintiff is investigating whether prisoners are being subjected to disability discrimination under Title II part A of the ADA and §504 of the Rehabilitation Act.

3.  The Defendants' actions set forth below have unlawfully and intentionally interfered with Plaintiff's investigations into these abuses, thereby impeding Plaintiff's ability to carry out its responsibilities under the P&A Acts, and subjected the Plaintiff to concrete harm to its statutorily defined interests.

## II.  JURISDICTION

4.  This Court has jurisdiction of this action pursuant to 28 U.S.C. §§ 1331 and 1343 (3) and (4). Declaratory relief is authorized pursuant to 28 U.S.C. §§ 2201 and 2202.

## III.  PARTIES

5.  Plaintiff Advocacy Center is a non-profit corporation designated as an "eligible system" as those terms are used and defined in the P&A Acts. Plaintiff provides protection and advocacy to people with disabilities. Under the P&A Acts, Plaintiff has broad access rights to prisoners in Defendants' facilities and to facility records for the purpose of investigating allegations of neglect and abuse, monitoring facility conditions, and providing protection and advocacy services to specific prisoners. Such access includes "reasonable unaccompanied access" to facilities and to all areas of the facility that are used by residents or are accessible to residents at all times necessary to conduct a full investigation of abuse or neglect. 42 U.S.C. §§ 10805(a)(3), 15043(a)(2)(H); 42 C.F.R. 51.42(b) (PAIMI regulations).

6.  Defendant James M. LeBlanc is Secretary of the Louisiana Department of Public Safety and Corrections (hereinafter the "Department"). He is responsible for the policies of the Department, and for the administration, control, and operation of the

functions, programs, and affairs of the Department, pursuant to L.R.S. §36:403. He has ultimate responsibility for the operation of the DWCC both through his personal involvement and through training and supervision of Defendant Goodwin. He is sued in his official capacity for declaratory and injunctive relief.

7. Defendant Jerry Goodwin is Warden of DWCC. He is responsible for the policies, procedures, operations, and administration of DWCC, including specifically determining the parameters of Plaintiff's access to DWCC prisoners, facilities, and staff. DWCC is a "facility" as that term is used and defined in the P&A Acts. He is sued in his official capacity for declaratory and injunctive relief.

8. Defendant Lonnie Nail is a Colonel at DWCC who exercised control over the N-4 unit and who accompanied Plaintiff's employees and agents during their tour of DWCC. He also otherwise supervised Plaintiff's visits to the facility. He directly executed the decisions made by Defendant Goodwin and he also personally set policy and parameters of Plaintiff's access to staff, prisoners, and facilities. Defendant Nail was clear that he was acting in concert and communication with Defendant Goodwin. Nail is sued in his official capacity for declaratory and injunctive relief.

9. At all times complained of herein, Defendants were acting under color of state law.

IV.   FACTS

*June 2017 Site Visit*

Advance Negotiation of Access to DWCC for Inspection

10. For months, Plaintiff Advocacy Center has received alarming reports of serious abuse of people with disabilities incarcerated in the lockdown units at David Wade Correctional Center in Homer, Louisiana. It is Plaintiff's federal statutory mandate to

3

investigate and respond to allegations of abuse of persons with disabilities. Plaintiff determined, based on narratives from interviews, complaints from inmates, and records provided by the Department that probable cause exists to investigate the following allegations of abuse and neglect:

> (i) Failing to provide adequate mental health treatment to people housed at DWCC;
> (ii) Failing to properly screen for mental illness;
> (iii) Placing people with mental illness in extended solitary and segregated confinement; and
> (iv) Committing acts and omissions against people with mental and developmental disabilities that cause or exacerbate emotional and mental harm including (1) stripping them of clothing during the winter, turning fans on them, and opening windows (2) turning heaters on during the summer time and not allowing people with mental or other disabilities to cool down by removing their jumpsuits (3) forcing people unnecessarily to kneel on the ground or bend on all fours and bark like dogs in order to receive food (4) forcing at least one person with a developmental disability to unclog toilets by hand (5) treating mental health complaints as disciplinary infractions (6) utilizing a malingering rule which deters people with serious mental illness from filing for help (7) spraying prisoners with mace and bleach (8) slapping, punching and kicking prisoners with both developmental disabilities and mental illnesses (9) engaging in severe verbal abuse of people, including name-calling and cursing of people with disabilities, and (10) extended use of physical restraints and a restraint chair.

11. On June 2, 2017, Advocacy Center attorney Jonathan Trunnell sent a letter via e-mail to counsel for the Department, Susan Griffin, stating the Advocacy Center's intention to conduct a site visit to DWCC as part of its investigation into abuse and neglect of people with mental illness. This letter stated that Advocacy Center would expect to spend a full day in the N-4 unit and specifically cited to the Advocacy Center's broad authority to communicate with and receive communication from people housed at a facility within the meaning of the P&A Acts. In that letter, the Advocacy Center offered to work with the Department to schedule the visit at a convenient time.

12. Having received no reply by June 9, 2017, Jonathan Trunnell sent a follow up letter specifying June 21-23, 2017 as the dates the Advocacy Center would be conducting its investigation. This letter identified the Advocacy Center staff and agents who would be carrying out the investigation: Jonathan Trunnell, Katie Schwartzmann, Derek Warden, and A'Niya Robinson.[1] The letter also identified the prisoners housed at DWCC with whom the investigatory team would need time to speak individually, following the site visit of the unit. Plaintiff specifically delineated that the agents would spend one day touring the unit and two days in individual meetings with incarcerated people.

13. On June 13, 2017, the Department's counsel responded and, following a brief e-mail exchange, agreed that the dates were acceptable. At no point in this exchange did the Department's counsel indicate that it had any intention of opposing the Advocacy Center's statutory access authority.

Arrival at David Wade Correctional Center and Discussion with Warden Goodwin

14. On June 21, 2017, the P&A Investigators began conducting an inspection and investigation of David Wade Correctional Center. The P&A Investigators were, at all relevant times, employees of the Advocacy Center. Katie Schwartzmann is an attorney employed by the MacArthur Justice Center, present in her capacity as an authorized agent for the Advocacy Center.

15. All of the P&A Investigators traveled several hundred miles from New Orleans to Homer to conduct an inspection and several interviews as part of its investigation. The travel was undertaken at significant financial and personnel expense to both organizations. It was carefully coordinated with Defendants in advance to ensure that resources were not wasted.

---

[1] Throughout this complaint, Plaintiff's employees and its agent will be referred to collectively as

5

16. When the P&A Investigators arrived at DWCC, they proceeded immediately to Warden Goodwin's office, per their e-mails with the Department. Defendant Goodwin informed them that the tour of the unit would be very brief because they would not be allowed to speak to any prisoners on the tiers. Defendant Goodwin stated that he contacted the attorney for the Department of Corrections, Susan Griffin, and that she confirmed that the P&A Investigators would not be allowed to speak to prisoners during the walk through.

17. P&A Attorney Jonathan Trunnell informed Warden Goodwin that he was violating the P&A Acts. Attorney Jonathan Trunnell requested counsel for the DPS&C communicate with lead counsel for the Advocacy Center. Following this request, attorney Susan Griffin had a call with lead counsel, attorney Ron Lospennato. Still, the Department continued to refuse to allow the P&A Investigators to communicate with prisoners on the tier. Plaintiff thus proceeded with a cursory tour of the housing unit.

Tour of the N-4 Housing Unit

18. Defendant Goodwin brought the P&A Investigators to the housing unit they were to view. He placed them under the supervision of Defendant Colonel Lonnie Nail, who was leading the P&A Investigators' visit. Defendant Goodwin then departed.

19. When the P&A Investigators entered the housing unit's lobby area, attorney Derek Warden inquired about its age. In response, Col. Nail stated that employees of DWCC were not allowed to answer his questions. Col. Nail instructed accompanying staff not to answer questions posed by the P&A Investigators during the visit.

20. When the P&A Investigators entered Tier A of the N4 Housing Unit, almost every prisoner asked to speak to them, asked who they were, and asked the P&A Investigators if they were from the Advocacy Center or MacArthur. Some inmates pleaded

the "P&A Investigators."

6

for help, others asked questions, some shouted. Col. Nail informed every prisoner that they were not allowed to speak to the P&A Investigators. At no time during any of these exchanges did any inmate express any threatening or disruptive intent; they simply wanted to speak with the Investigators.

21. While still on Tier A, attorney Katie Schwartzmann asked to view an empty "camera cell." This cell is used to monitor prisoners with acute needs or who are in serious mental health crises. She wanted to see where the camera was placed in order to determine if it is adequately placed, covered, or otherwise damaged. Col. Nail denied her request and, after being reminded that the P&A Investigators were there in capacity as P&A agents, stated that the P&A Investigators were only allowed to walk the tiers.

22. When the P&A Investigators walked on Tier B of the N4 Housing Unit, they were once again hailed with cries for help, requests for information, and shouting. On this tier, several inmates screamed for help or information. As before, the P&A Investigators were informed that they could not speak to prisoners or give them any information. Col. Nail informed these prisoners that the Investigators were not allowed to speak to them.

23. When attorney Katie Schwartzmann attempted to speak to a man asking for help, Colonel Nail placed his hand in her face, waived it upward and told her that she was not allowed to speak to prisoners.

24. When on Tier B, attorney Derek Warden asked security personnel about the facility's policy on suicide mattresses. An officer began to answer the question of his own volition. Colonel Nail then informed the staff again that they were not allowed to answer the questions of the P&A Investigators.

25. After the tour of Tier B, the P&A Investigators began walking to Tier C and noted that several prisoners were being moved off of the tier they were about to enter.

7

Among the prisoners being moved was a man who had been consistently seeking assistance from the P&A Investigators. The individual was being intentionally moved to prevent his having contact with the P&A Investigators. This was done purposefully to prevent the P&A Investigators from communicating with him.

26. While on Tier C, as with every other tier, several prisoners asked for help from the P&A Investigators and attempted to engage with them in conversation. Some inmates shouted and some were more conversational in their requests for help. Some inmates made no sound or movement while observed by staff or P&A Investigators, as if catatonic. The P&A Investigators and prisoners were yet again informed of the prison's policy that the P&A Investigators were not allowed to speak to them. The officers quieted several prisoners who attempted to engage in conversation with the Investigators.

27. During the visit on Tier C, attorney Derek Warden once again inquired about suicide-resistant mattresses. He did so because there were mattresses on the floor haphazardly in the tier hallway. Once again he was informed that he could not speak to the staff.

28. Near the end of the visit to Tier C, attorney Derek Warden inquired about accessing an empty cell in order to determine whether its dimensions complied with the ADA and to evaluate the footprint, airflow and other housing conditions that would affect a person with disabilities housed therein. Colonel Nail informed him that he was not allowed to enter the cells.

29. The P&A Investigators then viewed Tier D. On this tier, once again, several prisoners called out for help but were informed that the P&A Investigators were not allowed to speak to them.

30. The P&A Investigators asked if they could view the recreation yard to determine its compliance with the ADA, and evaluate how mentally ill prisoners are afforded their recreation time. Colonel Nail denied access to the recreation cages.

31. In sum, throughout the walk, although dozens of prisoners with obvious disabilities or housed in suicide-resistant clothing and cells requested help, saying "I need help," and "please help me," the P&A Investigators were not allowed to communicate with the prisoners to determine the basis for their requests and the nature of harms, if any, that they were experiencing. The conduct of Defendants in preventing P&A Investigators from speaking with those people was an unlawful impediment to the exercise of the investigatory authority vested in Plaintiff by federal statute.

Seizure of Contact Information and Legal Information

32. Counsel had scheduled two days of individual client interviews after one day of site inspection. Because the Defendants truncated the site inspection by prohibiting contact with prisoners, the P&A Investigators began individual interviews immediately after the walk through, on the first day of their visit.

33. During individual interviews one client asked attorney Katie Schwartzmann to write down her information. She gave the individual a piece of paper to help him remember the identities of the P&A Investigators to whom he was talking. On this paper she had written, "Katie Schwartzmann MacArthur Justice Center/ Derek Warden Advocacy Center."

34. Once the interview was over and as the client was leaving the visitation area, a member of the security staff then took the paper from the client, returned it to attorney Schwartzmann and stated that counsel were not allowed to give any written documents to prisoners.

9

35. Attorney Schwartzmann pointed out that she was providing her name to a person with a disability. Defendant Nail stated that no documents could be passed. Attorney Schwartzmann pointed out that she was an attorney with a right to confidential communications with prospective clients, and that Defendants should not read or monitor communications between counsel and prospective clients. Defendant Nail stated that Defendant Goodwin mandated that no documents be passed.

36. By preventing clients and other prisoners from passing written notes to the P&A Investigators and by preventing the P&A Investigators from providing vital written information to clients and other prisoner, Defendants interfered with the P&A Investigators' ability to learn information about the conditions at the prison and assess the validity and viability of the complaints of the abuse or neglect made against this facility. Such actions also hindered the right and ability of the P&A Investigators to interact with persons that the P&A was created to serve.

37. Throughout both days of interviews, prison staff periodically passed through the interview area or stood at the open entryway to the room, potentially close enough to overhear even low-volume conversations.

<u>Interference with Legal Documents</u>

38. On the second day of interviews, prisoners informed the P&A Investigators that they were instructed that they could not bring documents to the Investigators for their meetings. The prisoners expressed that they had saved notes, lists, and documents of the abuse occurring at DWCC that they wanted to convey to the P&A Investigators. Accordingly, prisoners who had made important notes to convey to agents of the Plaintiff were unable to do so. The P&A Investigators were further informed that one prisoner who

10

transported information to the preceding day's attorney meetings was disciplined for doing so.

39. The P&A Investigators, through attorney Trunnell, immediately requested that Col. Nail produce the individuals that were disciplined for communicating with agents of the Plaintiff. The P&A Investigators were extremely concerned that those individuals were being subjected to retaliation and additional abuse as a result of participating in a disability abuse investigation. Col. Nail informed attorney Trunnell that he would not allow him to meet with the disciplined individuals.

40. Col. Nail informed the P&A Investigators that, apparently overnight, the prison had adopted a policy of disallowing documents to be brought to meetings with Plaintiff's lawyers. They informed counsel that prisoners were disciplined for bringing items the previous day. Defendants' actions were undertaken as retaliation for both first amendment activity and participation in an abuse investigation against Defendants.

*July 2017 Attorney Visits*

41. On July 13, 2017, attorney Katie Schwartzmann again notified Defendant Goodwin that she and other individuals were coming to DWCC to meet with various prisoners. After negotiation with Defendant Goodwin to arrive at a mutually agreeable date and time, the visits were scheduled.

42. Schwartzmann made clear that the attorneys wanted to see one prisoner named "J.W." J.W. was intentionally selected for a visit because Schwartzmann and the Advocacy Center had reason to believe that he was extremely suicidal and at risk of immediate harm.

43. On July 17, 2017, the Investigators traveled hundreds of miles to DWCC for the scheduled visit. Defendant Nail informed them that they would not be allowed to visit J.W. because he was on suicide watch and hunger strike. The Investigators through Katie Schwartzmann informed Col. Nail that it was very important that they see him. Col. Nail said that it was orders of Warden Goodwin that Investigators not be allowed to visit J.W. The Investigators asked to speak to Warden Goodwin and were told that he was on vacation. They asked who was in charge in his absence, and Col. Nail said that he, Col. Nail, was. They asked Col. Nail to reconsider the denial of access to J.W. Col. Nail stated that he would not.

44. The Investigators through Derek Warden informed Col. Nail that the P&A needed access to J.W. Attorney Warden requested that the Investigators be brought to J.W., if J.W. could not leave his cell. Col. Nail refused. Attorney Warden stated that the P&A Plaintiff was attempting to assert its access authority under the P&A Acts. Col. Nail again refused.

45. The Investigators were unable to see J.W., a person with known mental illness suspected of being abused and neglected, despite having traveled hundreds of miles to see him out of concern for his well-being and safety.

V.     CAUSE OF ACTION—42 U.S.C. §1983

46. Plaintiff realleges the matters set forth above in paragraphs 1 through 45.

47. The P&A Acts provide Plaintiff with the right and authority to have access to facilities and residents. 42 U.S.C. §§ 10805(a)(3), 15043(a)(2)(H) and 42 C.F.R. Part 51. This access authority includes, but is not limited to:

   a. Reasonable unaccompanied access to all areas of the facility which are used by residents or which are accessible to residents. 42 C.F.R. § 51.42(b); 42 C.F.R. § 42(c).

b. Access to a facility for the purpose of providing information and training about individual rights and the protection and advocacy services available from the P&A system. 42 C.F.R. § 51.42(c)(1).

c. Access to monitor compliance with respect to the rights and safety of residents and to inspect, view and photograph all areas of the facility which are used by residents or are accessible to residents. 42 C.F.R. § 51.42(c)(2); 42 C.F.R. 51.42(c)(3).

d. Access to speak to residents and employees of the facility. 45 C.F.R §1386.22(f); 42 C.F.R. §51.42(b).

48. Defendants' acts and omissions set forth above have deprived Plaintiff of rights under the P&A Acts, including, but not limited to, the Protection and Advocacy for Individuals with Mental Illness Act ("PAIMI Act"), 42 U.S.C. §§ 10801 *et seq.*; the Developmental Disabilities Assistance and Bill of Rights Act of 2000 ("PADD Act"), 42 U.S.C. §§ 15001 *et seq.*; and the Protection and Advocacy of Individual Rights Program ("PAIR Act"), 29 U.S.C. § 794e. Therefore, Plaintiff has a cause of action pursuant to 42 U.S.C. §1983, because Plaintiff has been denied a federally protected right by state actors acting under color of law.

49. Plaintiff is entitled to recover its attorneys' fees, costs, and expenses in this action pursuant to 42 U.S.C. §1988.

## VI.     PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that this Court:

A. Declare that Defendants' failure to grant Plaintiff sufficient access to fully investigate the conditions of DWCC violates Plaintiff's rights under the P&A Acts, including 42 U.S.C. § 10805 (a) (4) (A), and 42 U.S.C. § 15043(a)(2)(B), as enforceable through 42 U.S.C. § 1983;

13

B.  Declare that Defendants' failure to grant Plaintiff the right to speak with employees violates its rights under the P&A Acts;

C.  Declare that Defendants' failure to allow Plaintiff the right to speak to prisoners on the tiers violates its rights under the P&A Acts;

D.  Declare that Defendants' act in prohibiting prisoners from bringing information to the Investigators or receiving information from the Investigators violated Plaintiff's rights under the P&A Acts;

E.  Declare that Defendants have an affirmative obligation to assure that the access rights granted to Plaintiff by the P&A Acts are fully and uniformly implemented at all of Defendants' facilities;

F.  Grant Plaintiff preliminary and permanent injunctions requiring Defendants to allow access to prisoners on tiers, conversations with prisoners, provision of information to prisoners in written form, and to allow prisoners to bring documents with them to meetings with P&A attorneys and their agents;

G.  Preliminarily and permanently enjoin Defendants from violating Plaintiff's rights under the P&A Acts;

H.  Waive the security requirement of Rule 65(c);

I.  Order Defendants to pay Plaintiff's reasonable attorneys' fees and costs; and

J.  Order any other and further relief, both legal and equitable, to which Plaintiff may be entitled.

Respectfully submitted this 20th day of June 2017,

        */s/ Ronald Lospennato*
        Ronald K. Lospennato, La. No. 32191, T.A.
        Jonathan C. Trunnell, La. Bar No. 36956
        Advocacy Center
        8325 Oak Street
        New Orleans, LA 70118
        504-708-1460
        504-507-1956   (fax)
        jtrunnell@advocacyla.org
        rlospennato@advocacyla.org

        */s/ Katie M. Schwartzmann*
        Katie M. Schwartzmann, La. Bar No. 30295
        Roderick & Solange MacArthur Justice Center
        4400 S. Carrollton Avenue
        New Orleans, La 70119
        p. (504) 620-2259
        katie.schwartzmann@macarthurjustice.org